IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re PHYSIOTHERAPY HOLDINGS, INC., *et al.*, : | Chapter 11 |
| : | Bankr. Case No. 13-12965-KG |
| Debtors. : | (Jointly Administered) |
| : | |
| PAH LITIGATION TRUST, : | Adv. Proc. No. 15-51238-KG |
| : | |
| Plaintiff, : | |
| v. : | Misc. No. 16-201-LPS |
| : | |
| WATER STREET HEALTHCARE : | |
| PARTNERS L.P., *et al.*, : | |
| : | |
| Defendants. : | |

## **MEMORANDUM ORDER**

Having reviewed the papers submitted in connection with Defendants' motion for leave

to appeal (D.I. 1, 18) (the "Motion for Leave") the Bankruptcy Court's Memorandum Opinion

and Order[1] (the "Interlocutory Order"), which granted in part and denied in part Defendants'

motion to dismiss (Adv. D.I. 106)[2] the above-captioned adversary proceeding, and Plaintiff's

opposition thereto (D.I. 13); and having reviewed the papers submitted in connection with

Defendants' petition for certification of direct appeal to the United States Court of Appeals for

the Third Circuit (D.I. 4, 18) (the "Petition") and the opposition thereto (D.I. 14); and having

reviewed the notices of subsequent authority (D.I. 16, 20);

IT IS ORDERED that the Motion for Leave and Petition (D.I. 1, 4) are DENIED for the

reasons that follow:

---

[1] *PAH Litig. Trust v. Water St. Healthcare Partners L.P., et al. (In re Physiotherapy Holdings, Inc.)*, 2016 WL 3611831 (Bankr. D. Del. June 20, 2016).

[2] The docket of the adversary proceeding, *PAH Litig. Trust v. Water Street Healthcare Partners L.P.*, Adv. No. 15-51238-KG, is cited herein as "Adv. D.I. __." The Chapter 11 docket, *In re Physiotherapy Holdings, Inc., et al.*, No. 13-12965-KG, is cited herein as "B.D.I. __."

**1. *Introduction.*** Defendants seek leave to appeal the Interlocutory Order which granted in part and denied in part their motion to dismiss an adversary proceeding initiated by the PAH Litigation Trust (the "Trust" or "Trustee"), as the authorized representative of the Debtor's estate. The Trustee's complaint asserted eight fraudulent transfer claims against numerous defendants including Water Street Healthcare Partners, L.P. ("Water Street") and Wind Point Partners IV, L.P. ("Wind Point") (collectively, the "Defendants" or the "Controlling Shareholders") and certain subsequent transferees. The complaint seeks to recover $248.6 million in payments made to the Controlling Shareholders and other selling shareholders (the "Selling Shareholders") in exchange for their equity in Physiotherapy Holdings, Inc. ("Physiotherapy" or the "Debtor"). Trustee alleges that in order to finance the sale of Physiotherapy, the buyer's ("Court Square" or the "Purchaser") merger subsidiary issued $210 million in senior secured notes (the "Secured Notes"). Pursuant to the terms of the transaction, the Debtor assumed the Secured Notes and certain other liabilities. Physiotherapy issued the Secured Notes pursuant to an offering memorandum (the "OM"), which the Trustee alleges fraudulently overstated the Debtor's revenue stream and its overall firm value. According to the complaint, the Purchaser ultimately acquired an insolvent company, and the Secured Noteholders received debt instruments worth far less than their face value. The Trustee alleges that this sequence of events led to the Debtor's chapter 11 petition and seeks to claw back certain payments made to the Selling Shareholders under both state and federal fraudulent transfer law.

**2. *Background.*** The Interlocutory Order sets forth the relevant background, including allegations contained in the complaint:

> The Debtor is a leading provider of outpatient physical
> therapy services throughout the United States. Compl. ¶ 3.[3]
> Defendants Water Street and Wind Point are private equity funds

---

[3] Adv. D.I. 1.

whose portfolio companies consist of businesses in the healthcare sector. Compl. ¶ 2. As of 2012, the Debtor operated approximately 650 clinics in 33 different states and derived the majority of its revenue from outpatient rehabilitation services. Def.'s Br. 14.[4] In 2007, Defendant Water Street acquired Physiotherapy for roughly $150 million. *Id.* Shortly after the transaction closed, Water Street entered into an agreement (the "2007 Merger") to merge the Debtor with Benchmark Medical, Inc. ("Benchmark"), an "outpatient physical therapy chain that Wind Point had previously acquired." *Id.* Following the 2007 Merger, Water Street owned 45% of the common stock of the surviving entity while Wind Point held a 35% ownership stake. *Id.* Throughout the next five years, the Controlling Shareholders gradually increased their ownership to approximately 90% of the Debtor's common shares. Compl. ¶¶ 14, 16. The Trustee alleges that during this time, Water Street and Wind Point engaged in various forms of accounting fraud in order to overstate Physiotherapy's financial health and reap a substantial profit from the sale of their shares. *Id.*

. . .

The alleged fraud began as a result of the 2007 Merger as the Debtor was faced with numerous operational challenges arising from the Controlling Shareholders' efforts to integrate the accounting systems of Benchmark and Physiotherapy. Compl. ¶ 3. According to the Trustee, "[t]here were delays in implementing a new single accounting system to replace the various legacy systems; there were problems keeping up with cash collections; and there were almost no internal financial reporting controls." *Id.* The Complaint further alleges that the Debtor began to overstate its EBITDA, net revenue, and accounts receivable in 2010 in order to conceal these problems. Compl. ¶ 4.

. . .

By 2009, Physiotherapy's financial condition had deteriorated significantly. Compl. ¶ 36. In response, the Controlling Shareholders allegedly began to implement new strategies in order to sell [Physiotherapy] by 2011 or 2012 and maximize the potential sales consideration. Compl. ¶ 37. One particular strategy was to abandon the "look back method" of revenue recognition and adopt the more controversial "rate bridge method." Compl. ¶ 39. Physiotherapy's board was, according to the Trustee, aware of and sanctioned the use of the rate bridge method. Compl. ¶ 43. According to the Complaint, the rate bridge method estimates revenue by calculating "a 'net rate per visit' based on the prior month's net rate per visit – which was, at the time, based on an estimate – and adjusted upward or downward

---

[4] Adv. D.I. 107.

3

based on supposed increases and/or decreases to the published rates and assumptions about the amount Physiotherapy could charge per visit or per 'unit.'" Compl. ¶ 40. Unlike the look back method, the rate bridge method is not based on actual historical collections and may be subject to manipulation. Compl. ¶¶ 41-42. [Allegedly,] within six months of switching to the rate bridge method, the Debtor's management became aware that [Physiotherapy's] net revenue had been overstated. Compl. ¶ 44. Nonetheless, it continued to apply this revenue recognition methodology.

. . .

The marketing process formally began in October 2011 when the Controlling Shareholders solicited bids from more than 100 potential buyers. Compl. ¶ 45. . . . As participants dropped out of the auction process, Water Street and Wind Point allegedly pressured the Debtor's senior management into "manipulat[ing] Physiotherapy's net revenue and patient visit counts so that Physiotherapy could be marketed as a company that was able to grow its net revenue per visit year over year." Compl. ¶ 47. The Complaint specifically details six forms of alleged accounting fraud that enabled the Defendants to inflate Physiotherapy's earnings. Compl. ¶¶ 48-54.

. . .

The Trustee also quotes numerous emails from the Debtor's billing and collections vendor indicating that the Debtor was instructing them to falsify its financial statements. Compl. ¶ 55. During this time, the Debtor began to develop substantial cash shortfalls as a result of these procedures. Compl. ¶¶ 61-70. The Complaint alleges that this growing discrepancy between revenue and cash collections was a result of Physiotherapy's switch to the rate bridge method. Compl. ¶ 72.

According to the Trustee, the Board of Directors was aware that the Debtor's use of the rate bridge method had led to inflated revenue. Compl. ¶¶ 59-61. Additionally, the Board was presented with tangible evidence that Physiotherapy was experiencing significant cash collection shortfalls. Compl. ¶¶ 61-63. . . . The Trustee further alleges that various third parties presented the Board with tangible evidence that Physiotherapy had been overstating its revenue. Compl. ¶ 74.

. . .

Throughout this time, the Debtor had been engaged in an extensive marketing process. Court Square, a private equity firm, emerged as the winning bidder with a cash offer of $510 million. Def.'s Br. 20. The deal was structured as a reverse-triangular merger, and Court Square created a subsidiary to merge into Physiotherapy with Physiotherapy as the surviving entity. The

subsidiary financed the transaction by issuing: "(i) a $100 million term loan (the "Term Loan"), which was part of a larger credit facility; (ii) $210 million in Secured Notes underwritten by Jefferies and RBC (the "Secured Notes"); (iii) a management equity rollover; and (iv) a minority investment by a third-party." Def.'s Br. 23. According to the Trustee, these Secured Notes were marketed with an OM that falsely represented Physiotherapy's pre-tax net income and unadjusted EBITDA. Compl. ¶ 82. The Trustee asserts that the OM overstated pre-tax net income by at least 936% and unadjusted EBITDA by 109% for fiscal year 2011. Compl. ¶¶ 83-84. Under the terms of the deal, the new Physiotherapy assumed this debt, and Water Street and Wind Point received $248.6 million in exchange for their shares. Compl. ¶ 88. Allegedly, the Controlling Shareholders profited handsomely from the fraud while [Physiotherapy] was left insolvent. Compl. ¶ 89. "The sum of all of the foregoing was that Physiotherapy incurred a massive amount of new debt—predicated on false financials—the proceeds of which were transferred out to Physiotherapy's former owners without receiving anything of value in return." *Id.*

. . .

Shortly after the transaction closed, [Physiotherapy's] new owner retained Deloitte to investigate a gap in accounts receivable and cash collections from the previous years. Deloitte determined that the Debtor's net income had been overstated for the years 2010 and 2012.

*Physiotherapy*, 2016 WL 3611831, at *2-*4.

In December 2012, eight months after the transaction closed, Court Square and the Defendants entered into an agreement containing a general release of claims ("Release"). The agreement containing the Release resolved certain "post-closing disputes" relating to the transaction. (*See* D.I. 1 at 16) On April 2, 2013, Physiotherapy defaulted on the Senior Notes, and, on November 12, 2013 (the "Petition Date"), it filed for relief under chapter 11 of the Bankruptcy Code. Pursuant to the confirmed Plan, the Trust was created and authorized to pursue causes of action belonging to the estate. (*See* B.D.I. 197-1 at 27-28) Additionally, the Secured Noteholders assigned their individual claims to the Trustee; as a result, the Trust had standing to assert claims in the capacity of both an estate representative and an assignee. *See Physiotherapy*, 2016 WL 3611831, at *4.

5

On September 1, 2015, the Trustee filed the eight-count complaint which asserted various claims for actual and constructive fraudulent transfer under the Bankruptcy Code and Pennsylvania law. Count I of the complaint seeks avoidance and recovery of actual fraudulent transfers to Defendants, as initial transferees, pursuant to section 548(a)(1)(A)[5] of the Bankruptcy Code. Count II similarly seeks avoidance and recovery of constructive fraudulent transfers to initial transferees pursuant to section 548(a)(1)(B)[6] of the Bankruptcy Code. Count III seeks avoidance and recovery of transfers to subsequent transferees under the foregoing sections of the Bankruptcy Code. Count IV seeks avoidance and recovery of actual fraudulent transfers from initial transferees under Pennsylvania's version of the Uniform Fraudulent Transfer Act, 12 Pa.C.S.A. § 5104(a)(1), and pursuant to section 544(b)[7] of the Bankruptcy

---

[5] Section 548(a)(1) of the Bankruptcy Code grants a trustee the power to avoid any transfer by a debtor of an interest in property made within two years before the filing of a bankruptcy petition if the transfer was actually or constructively fraudulent. *See* 11 U.S.C. § 548(a)(1). Pursuant to section 548(a)(1)(A), transfers or obligations incurred by a debtor may be avoided if made with actual intent to hinder, delay, or defraud a past or future creditor. The definition of "transfer" is broad, and includes "the creation of a lien," such as a security interest, and "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54).

[6] Section 548(a)(1)(B) of the Bankruptcy Code allows a trustee to avoid, *inter alia*, "any transfer . . . of an interest of the debtor in property" if the debtor "received less than reasonably equivalent value in exchange for such transfer" when the debtor was insolvent. *See* 11 U.S.C. § 548(a)(1)(B).

[7] Section 544(b) of the Bankruptcy Code authorizes the trustee to "avoid any transfer of interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." 11 U.S.C. § 544(b). A trustee proceeding under section 544(b) may avoid a fraudulent transfer in its entirety without regard to the value of any particular creditor's claim, and the trustee's recovery is shared by all unsecured creditors, potentially including creditors who could not themselves avoid the transfer under state law. *See In re Cybergenics Corp.*, 226 F.3d 237, 243 (3d Cir. 2000) ("Once avoidable pursuant to this provision, the transfer is avoided in its entirety for the benefit of all creditors.").

6

Code. Count V similarly seeks avoidance and recovery of constructive fraudulent transfers to initial transferees pursuant to section 544(b) of the Bankruptcy Code and 12 Pa.C.S.A. §§ 5104(a)(2) and 5105. Count VI seeks avoidance and recovery of transfers to subsequent transferees under Pennsylvania law. Because the Secured Noteholders assigned their individual claims to the Trustee, Count VII is asserted by the Trustee as a direct assignee of unsecured creditors (and not as an estate representative) and asserts direct claims under Pennsylvania law, 12 Pa.C.S.A. § 5104(a)(2), for avoidance and recovery of constructive fraudulent transfers to initial transferees. Finally, Count VIII seeks avoidance and recovery of transfers made to subsequent transferees under 12 Pa.C.S.A. §§ 5104(a)(2) and 5105.

In response to the complaint, Defendants moved to dismiss on several grounds, including: (1) all of the transfers are immune from avoidance pursuant to the Bankruptcy Code's safe harbor provision, 11 U.S.C. § 546(e),[8] which prohibits a trustee or estate representative from avoiding transactions involving the purchase and sale of securities, and, according to Defendants, prohibits creditors from pursuing recovery under state fraudulent transfer laws as well; (2) the claims against Defendants are barred by the Release; and (3) the Secured Noteholders ratified the transaction and are thus barred from seeking its avoidance. (*See* Adv. D.I. 107)

On June 20, 2016, the Bankruptcy Court entered the Interlocutory Order, granting the Motion to Dismiss in part and denying it in part. *See Physiotherapy*, 2016 WL 3611831, at *15.

---

[8] Section 546(e) provides that, notwithstanding section 544, "the trustee may not avoid a transfer that is a . . . settlement payment, as defined by section 101 or 741 [of the Bankruptcy Code], made by or to a . . . financial institution." 11 U.S.C. § 546(e). In response to Defendants' motion to dismiss, the Trustee argued that payments made to selling shareholders were not "settlement payments" in connection with a "securities contract;" because the Defendants' shares were converted into certificates redeemable for cash prior to the merger's closing, the Trustee argued that these certificates were not securities. (*See* Adv. D.I. 134 at 34) The Bankruptcy Court rejected the Trustee's argument, finding it inconsistent with the broad language of section 546(e) and controlling Third Circuit law on the issue. *See Physiotherapy,* 2016 WL 3611831, at *11.

The Bankruptcy Court granted the motion to dismiss with respect to Counts II, IV, and V of the complaint, determining that section 546(e)'s safe harbor prohibited the Trustee's assertion of constructive transfer claims under section 548(a)(1)(B) and actual and constructive fraudulent transfer claims brought under section 544(b). *See id.* In denying the motion to dismiss with respect to the fraudulent transfer claims brought directly under state law by the Trustee in the capacity of a creditor-assignee (Count VII), the Bankruptcy Court undertook a preemption analysis and rejected Defendants' argument that section 546(e) prohibits avoidance actions by creditors brought directly under state fraudulent transfer law. *See id.* at *10-*15. The Bankruptcy Court determined that neither the text nor the purpose of section 546(e) was implicated by the constructive fraudulent transfers at issue and declined to find that the safe harbor preempted state fraudulent transfer laws in this case. Specifically, the Bankruptcy Court held that "a litigation trustee may assert state law fraudulent transfer claims in the capacity of a creditor-assignee when: (1) the transaction sought to be avoided poses no threat of 'ripple effects' in the relevant securities markets; (2) the transferees received payment for non-public securities, and (3) the transferees were corporate insiders that allegedly acted in bad faith. When these three factors are present, a finding of implied preemption is inappropriate." *Id.* at *10. The Bankruptcy Court also determined that a finding of estoppel by ratification was inappropriate at this juncture and declined to dismiss the complaint on this basis. *See id.* at *12. The Bankruptcy Court further rejected Defendants' contention that the Trust's actual fraudulent transfer claim under section 548(A)(1)(a)[9] was barred by the Release executed by Physiotherapy before it filed its Chapter 11 petition and denied the motion to dismiss with respect to Count I. *See id.* at *14.

---

[9] Claims for actual fraudulent transfer pursuant to section 548(a)(1)(A) of the Bankruptcy Code do not fall under the safe harbor provision. *See* 11 U.S.C. § 546(e) ("[T]he trustee may not avoid a transfer that is a . . . settlement payment . . . except under section 548(a)(1)(A) of this title.").

Finally, the Bankruptcy Court rejected several other arguments that Defendants do not argue warrant interlocutory review. *See id.* at \*14-15.

On July 18, 2016, Defendants filed their Motion for Leave to appeal the Interlocutory Order with respect to three issues. (D.I. 1) On August 1, 2016, Defendants also filed the Petition (D.I. 4) in this Court, despite the fact that Federal Rule of Bankruptcy Procedure 8006(b) required Defendants to file the Petition in the court where the matter was then pending, and this matter was pending in the Bankruptcy Court until August 15, 2016. (*See* D.I. 14 at 18) At the time of briefing on these requests, discovery was underway with respect to the Trust's two remaining claims, with document production scheduled to be completed by January 2017 and depositions scheduled to be completed in June 2017. (*See* D.I. 13 at 3; Adv. D.I. 284) A review of the adversary docket demonstrates that discovery is scheduled to conclude by May 22, 2018, with any case dispositive motions to be served no later than June 20, 2018. (*See* Adv. D.I. 676 (Second Amended Scheduling Order))[10]

**3.** *Applicable Standards.* This Court has jurisdiction to hear appeals "with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C.

---

[10] There have been other recent developments as well. On November 1, 2017, the Bankruptcy Court entered an opinion and order (Adv. D.I. 624, 625) granting plaintiff's motion for partial summary judgment as to potential damages. Defendants have filed a notice of appeal (*see* Adv. D.I. 643) along with a motion for leave to appeal the interlocutory order (*see* Adv. D.I. 644; *see also* 17-mc-319-LPS D.I. 1). On November 6, 2017, the Bankruptcy Court entered an opinion/order (Adv. D.I. 630, 631), denying plaintiff's motion for leave to amend the complaint to: (1) add additional defendants, and (2) add a prayer for punitive damages under the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA").

§ 158(a)(3). Section 158(a) does not identify the standard district courts should use in deciding whether to grant such an interlocutory appeal. *See id.* "Typically, however, district courts follow the standards set forth under 28 U.S.C. § 1292(b), which govern interlocutory appeals from a district court to a court of appeals." *In re AE Liquidation, Inc.*, 451 B.R. 343, 346 (D. Del. 2011).[11]

Under the standards of section 1292(b), an interlocutory appeal is permitted only when the order at issue (1) involves a controlling question of law upon which there is (2) substantial ground for difference of opinion as to its correctness, and (3) if appealed immediately, may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b); *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 754 (3d Cir. 1974). Entertaining review of an interlocutory order under § 1292(b) is appropriate only when the party seeking leave to appeal "establishes exceptional circumstances [to] justify a departure from the basic policy of postponing review until after the entry of final judgment." *In re Del. and Hudson Ry. Co.*, 96 B.R. 469, 472-73 (D. Del. 1989), *aff'd*, 884 F.2d 1383 (3d Cir. 1989). In part, this stems from the fact that "[p]iecemeal litigation is generally disfavored by the Third Circuit." *In re SemCrude, L.P.*, 2010 WL 4537921, at *2 (D. Del. Oct. 26, 2010) (citing *In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988)). Further, leave for interlocutory appeal may be denied for "entirely unrelated reasons such as the state of the appellate docket or the desire to have a full record before considering the disputed legal issue." *Katz*, 496 F.2d at 754.

Pursuant to section 158(d)(2), certification for direct appeal to the circuit court is required if the Court, "acting on its own motion or the request of a party," determines that:

---

[11] *See also In re Philadelphia Newspapers, LLC,* 418 B.R. 548, 556 (E.D. Pa. 2009) ("Based upon the decision of the Third Circuit in *Bertoli v. D'Avella (In re Bertoli)*, 812 F.2d 136, 139 (3d Cir. 1987), courts within this Circuit confronted with the decision whether to grant leave to allow an interlocutory appeal are informed by the criteria in 28 U.S.C. § 1292(b)").

(i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

(ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

(iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken.

28 U.S.C. § 158(d)(2)(A)(i)-(iii). Thus, the standards for granting direct appeal certification are essentially the same as those to be applied by the district court in determining whether to grant leave to appeal under 28 U.S.C. § 1292(b). *See In re Advanced Marketing Services Inc.*, 360 B.R. 429, 434 (Bankr. D. Del. 2007) (observing that legal analyses required in consideration of motion for leave to appeal interlocutory order and petition for certification of direct appeal are "virtually identical").

4. *Analysis.* Defendants assert that their appeal of the Interlocutory Order involves not one but three controlling questions of law as to which substantial ground for difference of opinion exists. According to Defendants, these issues are: (i) "whether section 546(e) of the Bankruptcy Code preempts state fraudulent transfer claims," (ii) "whether a trustee can assert fraudulent transfer claims on behalf of creditors who have authorized and participated in the very transfer alleged to be fraudulent," and (iii) whether the Bankruptcy Court erred in its "determination that an otherwise valid release could later be undone through the expedient of a chapter 11 filing, notwithstanding the strong public policy favoring settlements." (D.I. 1 at 1-3)

A.     *Controlling Question of Law as to Which There Is Substantial Ground for Difference of Opinion*

"A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." *Katz*, 496 at 755. "'[C]ontrolling' means serious to the conduct of the litigation, either practically or legally. And on the practical level,

saving of time of the district court and of expense to the litigants [has been] deemed . . . to be a

highly relevant factor." *Id.* (internal citation omitted). The "controlling question of law" also

must be one as to which there is "substantial ground for difference of opinion." 28 U.S.C. §

1292(b). This calls for more than mere disagreement with the ruling of the bankruptcy court. To

satisfy this standard, "the difference of opinion must arise out of genuine doubt as to the correct

legal standard." *Hulmes v. Honda Motor Co.*, 936 F. Supp. 195, 208 (D.N.J. 1996), *aff'd,* 141

F.3d 1154 (3d Cir. 1998); *see also Patrick v. Dell Fin. Servs.*, 366 B.R. 378, 386 (M.D. Pa. 2007)

(same). This factor is also met when "the bankruptcy court's decision is contrary to well-

established law." *In re Marvel Entm't Grp., Inc.*, 209 B.R. 832, 837 (D. Del. 1997).

### i.     *Preemption*

With the exception of the Trustee's actual fraudulent transfer claim under section

548(a)(1)(A) (Count I), which the statute plainly carves out, Defendants argued that the section

546(e) safe harbor barred all of the Trustee's claims for avoidance under sections 544 and

548(a)(1)(B) of the Bankruptcy Code, as well as all of the fraudulent transfer claims asserted

under Pennsylvania law. *(See* Adv. D.I. 107 at 33-42) Section 546(e) of the Bankruptcy Code

provides, in relevant part:

> Notwithstanding sections 544 . . . [and] 548(a)(1)(B) . . . of this
> title, the trustee may not avoid a transfer that is a . . . settlement
> payment, as defined in section 101 or 741 of this title, made by or
> to (or for the benefit of) a commodity broker, forward contract
> merchant, stockbroker, financial institution, financial participant,
> or securities clearing agency, or that is a transfer made by or to (or
> for the benefit of) a . . . financial institution, [or] financial
> participant . . . in connection with a securities contract, as defined
> in section 741(7) . . . except under section 548(a)(1)(A) of this title.

Defendants argued that the safe harbor reflects Congress's clear intention to preempt state

fraudulent transfer law. According to Defendants, if an otherwise barred transfer could be

recovered under state law, thereby implicating the same concerns regarding the unraveling of

12

settled securities transactions that section 546(e) seeks to address, the exemption set forth in section 546(e) would be rendered useless. (*See* Adv. D.I. 107) Defendants relied primarily on the Second Circuit's decision in *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 124 (2d Cir. 2016), which resolved a divide within New York federal courts over this issue, and determined that section 546(e) preempts state fraudulent transfer law.[12] In reaching this conclusion, the Second Circuit observed that "[o]nce a party enters bankruptcy, the Bankruptcy Code constitutes a wholesale preemption of state laws regarding creditors' rights." *Id.* at 111. The Second Circuit also concluded that the larger purpose behind the safe harbor was "to promote finality for individual investors by limiting the circumstances, *e.g.*, to cases of intentional fraud, under which securities transactions could be unwound." *Id.* at 120 (internal citations and quotation marks omitted).

Conversely, the Trustee argued that section 546(e), by its express terms, only bars avoidance actions brought by a "trustee," and the Bankruptcy Code defines "trustee" as the statutory "representative of the estate."[13] Because the statute is silent as to creditors, the Trustee argues that a litigation trust may assert claims directly under state fraudulent transfer law so long

---

[12] Defendants' motion to dismiss relied on *Whyte v. Barclays Bank, PLC*, 494 B.R. 196 (S.D.N.Y. 2013), and the parties submitted supplemental briefing following the Second Circuit's decision in *Tribune*. In *Barclays*, the plan established a litigation trust to prosecute actions. *See* 494 B.R. at 198. The debtors and certain creditors assigned claims to the trust, including avoidance actions arising under the Bankruptcy Code and state law. *See id.* Relying on the policy underlying the section 546(g) safe harbor – another limitation on a trustee's avoidance power that protects transfers made to "swap participant[s]" or financial participant[s]" – the court held that section 546(g) preempted state fraudulent claims brought by a litigation trustee as an assignee. The *Barclays* court concluded that permitting a litigation trustee to assert such claims would create a substantial obstacle to Congress's objective of ensuring stability in the derivatives, commodities, and swap markets. *See id.* at 200-01.

[13] *See* 11 U.S.C. § 323(a) (defining role and capacity of trustee in case under Bankruptcy Code); *see also Grede v. Bank of New York Mellon*, 598 F.3d 899, 902 (7th Cir. 2010) (distinguishing between "trustee in bankruptcy" and "post-bankruptcy vehicle").

as such claims were assigned to the litigation trust by the creditors. (*See* Adv. D.I. 135 at 34-35)

In support of this argument, the Trustee cited the *PHP* case, in which this Court concluded that:

> if the avoidance action were brought by a trustee or debtor-in-possession (or the successor to a debtor-in-possession), the avoidance action would be barred by Section 546(e) of the Bankruptcy Code. However, in this case, PHP LLC has not asserted its claims against Movants in the capacity of a trustee or as a successor-in-interest to a trustee or debtor-in-possession. ***Rather, PHP LLC is bringing the instant claims as a direct assignee of the unsecured creditors.*** As such, Section 546(e) is not a bar to PHP LLC's claims.

*In re PHP Liquidating, LLC v. Robbins*, 291 B.R. 603, 607 (D. Del. 2003) (emphasis added), *aff'd sub nom. In re PHP Healthcare Corp.*, 128 Fed. App'x 839 (3d Cir. 2005).

The Bankruptcy Court undertook a preemption analysis and determined that while section 546(e) bars fraudulent transfer claims under §§ 548(a)(1)(b) and 544 of the Bankruptcy Code (*i.e.*, barring the Trust from asserting creditor claims in its capacity as an estate representative), it does ***not*** preempt state law fraudulent transfer claims brought by the Trust in its capacity as an assignee of creditors, if: (1) the transaction sought to be avoided poses no threat of "ripple effects" in the relevant securities markets; (2) the transferees received payment for nonpublic securities; and (3) the transferees were corporate insiders that allegedly acted in bad faith. *See Physiotherapy*, 2016 WL 3611831, at *10.

Defendants argue that a reversal of the Bankruptcy Court's preemption decision would result in the dismissal of the Trust's sole remaining constructive fraudulent transfer claim (Count VII) and, thus, presents a controlling question of law. (*See* D.I. 1 at 8) Defendants characterize the Bankruptcy Court's ruling as a sweeping "holding that Section 546(e) does not preempt state fraudulent transfer claims." (D.I. 1 at 1) But Defendants' characterization ignores the fact that the Bankruptcy Court's preemption ruling turned on facts specific to this case, including the nature of the transfers at issue and the basis for the Trust's claims. The Bankruptcy Court

14

determined that the transfers at issue did not involve publicly-traded securities, which eliminated the risk that avoidance would cause "any sort of ripple effect to the broader secondary market." *Physiotherapy*, 2016 WL 3611831, at *9. The Bankruptcy Court also noted that allegations that corporate insiders had acted in bad faith implicated additional policy concerns relevant to the preemption analysis, including "Congress' policy of providing remedies for creditors who have been defrauded by corporate insiders." *Id.* The Trustee argues that the requested interlocutory appeal does not present a controlling question of law because any implied preemption analysis is necessarily case-specific and applies only "when, 'under the circumstances of [a] particular case, [the state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (*See* D.I 13 at 19 (quoting *DeWeese v. Nat'l R.R. Passenger Corp. (Amtrak)*, 590 F.3d 239, 246 (3d Cir. 2009); *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941))

The Court agrees with the Trustee that the Bankruptcy Court's preemption analysis was specific to the facts of this case. The Court is not persuaded that Defendants have established a controlling question of law that justifies deviation from the fundamental judicial policy of deferring review until after the entry of a final judgment.

Nor is the Court convinced that a substantial ground for difference of opinion exists, as the Bankruptcy Court's preemption analysis followed well-established Third Circuit and Supreme Court law. In determining whether Congress occupied the field for exclusive federal regulation, the Bankruptcy Court began with Third Circuit's statement that the "'strong presumption against inferring Congressional preemption' also applies 'in the bankruptcy context' which may be overcome when 'a Congressional purpose to preempt . . . is clear and manifest.'" *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 419 (3d Cir. 2016) (quoting *In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 365 (3d Cir. 2012)); *see also BFP v. Resolution Trust Corp.*, 511 U.S. 531, 540, 544-45 (1994) ("[T]he Bankruptcy Code will be construed to adopt, rather

than to displace, preexisting state law."). "To discern the preemptive intent of Congress," the Bankruptcy Court proceeded to follow Supreme Court guidance and "look[ed] to the text, structure, and purpose of the [safe harbor] statute and the surrounding statutory framework." *Rosenberg,* 835 F.3d at 419 (citing *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 486 (1996)).

The Bankruptcy Court found the plain language of the statute setting out the safe harbor cut against preemption. For example, section 546 is titled "limitations on avoidance power," and by its express terms, Congress limited the safe harbor to certain avoidance actions ***brought by a bankruptcy trustee*** under sections "544, 545, 547, 548(a)(1)(B), and 548(b)." 11 U.S.C. § 546(e) ("***the trustee*** may not avoid . . ." certain transfers) (emphasis added). The safe harbor is silent with regard to a creditor's ability to bring such claims arising under state law rather than the Bankruptcy Code. *See Physiotherapy,* 2016 WL 3611831, at *9.

Looking to the structure of the safe harbor, the Bankruptcy Court noted that, in other sections of the Bankruptcy Code, Congress has explicitly stated when it intends for a provision to apply to entities other than the trustee (*see, e.g.,* 11 U.S.C. § 1109(b)); moreover, other Bankruptcy Code provisions expressly preempted state law by incorporating phrases like "notwithstanding any nonbankruptcy law" (*see e.g.,* 11 U.S.C. § 541(c)(1)). *See Physiotherapy,* 2016 WL 3611831, at *9.

Finally, looking to the purpose and legislative history of the safe harbor provision, the Bankruptcy Court noted that the safe harbors were originally enacted to protect commodities clearing agencies from massive liability, based on the theory that avoidance of margin payments could present significant systemic risk in the derivatives market, causing a "ripple effect" as the failure of a clearinghouse could adversely impact all market participants. *See id.* at *7. The Bankruptcy Court concluded that *Tribune* and similar cases placed too much emphasis on policy concerns which find minimal support in the Congressional record (*e.g.,* finality for individual

investors), whereas the legislative history suggests "sections 546(e) and 546(g) were enacted to further augment the protections against systemic risk codified in the initial safe harbors." *Id.* at *8. Adopting the reasoning set forth in *Lyondell* that was later rejected in *Tribune*, the Bankruptcy Court found "[n]othing in the legislative history of the existing law evidences a desire to protect individual investors who are beneficial recipients of insolvents' assets. The repeatedly expressed concern, by contrast, has been that of protecting market intermediaries and protecting the markets – in each case to avoid problems of 'ripple effects,' *i.e.*, falling dominos." *Physiotherapy*, 2016 WL 3611831, at *8 (quoting *In re Lyondell Chemical Co.*, 503 B.R. 348, 373 (S.D.N.Y. 2014)). Ultimately, the Bankruptcy Court concluded that the legislative history did not support an interpretation of the safe harbor as a broad preemption of all state law avoidance claims, and that preemption was not appropriate in this case. *See id.*

The Bankruptcy Court's reading of the safe harbor is supported by the plain language of the statute, and its careful preemption analysis followed controlling Third Circuit and Supreme Court precedent, which construes the Bankruptcy Code as adopting, rather than displacing, preexisting state law, absent a clear and manifest indication from Congress. *See id.* at *7-*10. Defendants argue there is genuine doubt as to the correct standard here based on the conflicting decision in *Tribune*. However, as noted by the Bankruptcy Court, the *Tribune* case involved publicly-traded securities, an important factual distinction that implicated the risk of "ripple effects" that Congress sought to avoid. *See Physiotherapy*, 2016 WL 3611831, at *9.[14] Because the transfers here were to corporate insiders, systemic risk concerns were not at issue. Defendants' mere disagreement with the outcome of the Bankruptcy Court's case-specific

---

[14] Similarly, in *Barclays,* the Trustee sought to avoid a large portfolio of swap transactions. *See* 494 B.R. at 198 (seeking avoidance of portfolio of transactions as fraudulent conveyance under New York debtor-creditor law).

preemption analysis is not a substantial ground for difference of opinion that justifies interlocutory appeal.

### ii.    Ratification

Defendants argued to the Bankruptcy Court that "[b]ecause the Noteholders knowingly authorized and participated in the transfer . . . they are estopped from seeking its avoidance." (Adv. D.I. 107 at 54)  Specifically, Defendants argued that the noteholders ratified the fraudulent transfers when they purchased their securities because they were aware that the proceeds from the issuance would be used to cash out the Selling Shareholders.  Thus, according to the Trustee, the noteholders are estopped from seeking to avoid the transfer they approved.  Defendants encouraged the Bankruptcy Court to adopt the view expressed in *Lyondell* that creditors "who authorized or sanctioned the transaction, or, indeed participated in it themselves, can hardly claim to have been defrauded by it, or otherwise victims of it." *Lyondell*, 503 B.R. at 383-84. The *Lyondell* Court concluded that a creditor's knowledge that it was lending "for the purpose of financing an LBO, and that the LBO proceeds would go to the stockholders," was sufficient to establish a ratification defense. *Id.* at 385.

Conversely, the Trustee argued that the noteholders could not have knowingly authorized and participated in the transaction because they purchased the notes based on fraudulent financial statements, and the proper question is whether these creditors "had full knowledge of all material facts" surrounding the transaction.  (Adv. D.I. 135 at 47) (internal quotation marks omitted)  In response, Defendants denied advancing a ratification defense "in the strict sense of the word" – contending that such a defense would apply only to claims for fraud as opposed to claims for fraudulent transfer.  Defendants argued that while courts have described the estoppel defense using different terms – including "ratification," "estoppel," or "material participation in the transaction" – the underlying theory, according to Defendants, remains the same: "a creditor who

participates in (or consents to or ratifies) a fraudulent transfer cannot later argue that the transfer should be avoided." (Adv. D.I. 163 at 4) "The real and indisputable point is that the Noteholders provided financing knowing the funds would be used to pay [Defendants] for their shares of [the Debtor]." (*Id.*) Because they participated in the transaction, "[t]he Noteholders (and the Litigation Trust as their representative) are thus estopped from challenging the very transfer to which they knowingly consented." (*Id.*)

In evaluating the defense, the Bankruptcy Court noted that ratification "is the act of knowingly giving sanction or affirmance to an act which would otherwise be unauthorized or not binding." *Physiotherapy*, 2016 WL 3611831, at *12 (citing 57 N.Y. Jur. 2d Estoppel, Ratification and Waiver § 87 (2007)). The Bankruptcy Court relied on *Tronox* and *Adelphia*, in which courts appear to have endorsed the "material facts" test articulated in *ASARCO*.[15] Noting that use of proceeds is simply one piece of the entire "fraud alleged in the complaint," the Bankruptcy Court concluded that there is a material dispute as to whether the Secured Noteholders had knowledge of the material facts of the transaction. *Physiotherapy*, 2016 WL 3611831, at *12. As the ratification defense hinged on factual issues which remained subject to further development in discovery, "a finding of ratification would be inappropriate at this juncture," and the Bankruptcy Court declined to dismiss the fraudulent transfer action based on this defense. *Id.*

---

[15] In *In re Tronox*, 503 B.R. 239, 276 (Bankr. S.D.N.Y. 2013), the court determined that because defendants "did not establish that the bondholders knowingly gave sanction to the fraudulent conveyances complained of in this case," a finding of ratification was inappropriate. In *Adelphia Recovery Trust v. HSBC Bank USA (In re Adelphia Recovery Trust)*, 634 F.3d 678, 693-94 (2d Cir. 2011), the Second Circuit noted: "[w]here the allegedly ratifying party's silent acquiescence to a transaction credibly appears to have resulted from the complexity of the situation rather than intent, ratification does not occur."

On appeal, Defendants assert that the Bankruptcy Court incorrectly characterized their defense as "ratification," when it should have applied the "estoppel" standard. According to Defendants, the vast majority of courts have not required "full knowledge of the facts surrounding the transaction" when considering the estoppel defense; rather, application of the defense requires only "knowledge of the transfer itself." (D.I. 1 at 15-16) Conversely, the Trustee argues it is Defendants who have conflated the issues: "the question here is what the elements of their defenses are, not what the elements of the Trust's claims are," and it is firmly established in common law "that the defenses of ratification and estoppel apply only when a party acts knowingly." (D.I. 13 at 11) The Trustee contends that Defendants' pleadings and case law demonstrate that concepts of ratification and estoppel are related, and "'no estoppel arises from the mere fact that the creditor has knowledge of the proposed transfer.'" (D.I. 13 at 10) (quoting 16A Cal. Jur. 3d § 410))

Defendants have not established that the Bankruptcy Court's ratification ruling involves a controlling question of law. Defendants contend that reversal on the ratification issue would result in dismissal of the entire case, sparing both the parties and the Court the expense and burden of litigating the action. (*See* D.I. 1 at 14) However, the Court agrees with the Trustee that Bankruptcy Court's ruling was not a final ruling on any defense – regardless of whether the applicable defense is characterized as ratification or estoppel – but, rather, a non-final determination that application of the defense was "inappropriate at this juncture." (D.I. 13 at 12-13) The Bankruptcy Court merely determined that facts regarding the creditors' knowledge and intent were relevant and must be developed before deciding whether a defense applies. *See Physiotherapy*, 2016 WL 3611831, at *12.

Nor have Defendants established substantial grounds for difference of opinion. Defendants argue that whether the doctrine of estoppel requires "knowledge of all material facts"

"appears to be a matter of first impression not only in this District but within this Circuit." (D.I. 1 at 14) (citing *Klapper v. Commonwealth Realty Trust*, 662 F. Supp. 235, 236 (D. Del. 1987) (finding that "substantial ground for difference of opinion" existed where issue presented "case of first impression")) However, again, all the Bankruptcy Court decided was that further factual development is required before applying the defense of ratification or estoppel. Moreover, it appears that the Bankruptcy Court applied well-settled tenets of law. (*See* D.I. 13 at 9-11)

### *iii.* *Prepetition Release*

Defendants argue that all of the Trustee's claims, including the actual fraudulent transfer claim under section 548(a)(1)(A), were barred by the Release that Physiotherapy executed prior to the Chapter 11 proceedings. (*See* Adv. D.I. 107 at 43-49) The Release bars any "claims for losses, damages, indemnification, or other payment" against any party "for any breach, violation or inaccuracy of any of the terms, conditions, covenants, agreements or representations and/or warranties in the Merger Agreement." (Adv. D.I. 108 at Ex. 8) Additionally the parties "irrevocably waive[d] all such claims, whether in law, equity, tort or otherwise, whether or not known now, heretofore or hereafter, whether anticipated or unanticipated, suspected, unsuspected or claimed, fixed or contingent." (*Id.*)

In moving to dismiss, Defendants argued that the Release barred the Debtor from asserting any fraud or fraud-based claims, and bars the Trust as well, because the Trust is standing "in the shoes" of the Debtor. (*See id.* at 43) The Bankruptcy Court disagreed, noting that post-petition avoidance actions can only be brought by the trustee after the petition is filed; and just as the prepetition debtor does not own the right to pursue a fraudulent transfer claim, it follows that the prepetition debtor may not waive such claims either. *See Physiotherapy*, 2016 WL 3611831, at *14 (citing *Official Comm. of Unsecured Creditors v. UMB Bank (In re Residential Capital, LLC)*, 497 B.R. 403, 424 (Bankr. S.D.N.Y. 2013)).

21

In concluding that the Trustee was not bound by the Release, the Bankruptcy Court relied on several Third Circuit cases. For instance, in *Lafferty*, the Third Circuit noted that actions that may be pursued by bankruptcy trustees generally fall into two categories: "(1) those brought by the trustee as successor to the debtor's interest included in the estate under Section 541, and (2) those brought under one or more of the trustee's avoiding powers." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 356 (3d Cir. 2001). Pursuant to section 541 of the Bankruptcy Code, the bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case," including "whatever causes of action the debtor may have possessed prior to the petition date." 11 U.S.C. § 541. Any action included in the estate under section 541 that is later pursued by a bankruptcy trustee is brought by the trustee as successor to the debtor's interest in that claim and is a "debtor cause of action." *In re IH 1, Inc., et al.*, 2016 WL 6394296, *13 (Bankr. D. Del. Sept. 28, 2016). The Third Circuit has noted that "the trustee stands in the shoes of the debtor" when bringing such actions, and is therefore "subject to the same defenses as could have been asserted by the defendant had the action been instituted by the Debtor." *Lafferty*, 267 F.3d at 356.

Claims that the Bankruptcy Code authorizes a trustee to assert on behalf of creditors, which are largely avoidance actions brought pursuant to sections 544, 547, and 548 of the Bankruptcy Code, are "creditor actions." The power to pursue such claims, as exercised by an estate representative, "relate[s] to the trustee's power to resist pre-bankruptcy transfers of property." *Id.* The Third Circuit has held that for purposes of section 548 avoidance actions, the trustee does not stand in the shoes of the debtor, as such claims are not "derivative of the bankrupt." *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149 (3d Cir. 1989) (holding claims under § 548 are "creditor claims" and "there is no justification for binding creditors to [an agreement's arbitration provision] with respect to claims that are not derivative

22

from the party to it"); *see also McNamara v. PFS (In re Personal & Bus. Ins. Agency),* 334 F.3d 239, 245 (3d Cir. 2003) ("The *Lafferty* Court made clear that its holding did not extend to actions brought under Code sections other than [section] 541").

Relying on these Third Circuit cases and other authorities, the Bankruptcy Court concluded that the Debtor had no ability to waive section 548 claims, and the Trustee was not bound by the Release. *See Physiotherapy,* 2016 WL 3611831, at *14. On appeal, Defendants assert the Bankruptcy Court erred in holding that "because a prepetition debtor does not own the right to pursue a fraudulent transfer claim in bankruptcy, the Release did not bar claims by the Trust brought post-petition on behalf of the Debtor." (D.I. 1 at 17)

Defendants assert that this issue presents a controlling question of law because reversal on the effect of the Release would result in dismissal of the Trustee's claim under section 548(a)(1)(A) for actual fraudulent transfer. (*See id.*) The Trustee disagrees, contending that because the Bankruptcy Court held that the Release did not bind the Trustee, the Bankruptcy Court did not have to decide whether the terms of the Release encompass the actual fraudulent transfer claim. (*See* D.I. 13 at 8-9) The Trustee argues that the Release only applies to claims for "breach, violation or inaccuracy of any terms, conditions, covenants, agreements or representations and/or warranties *in the Merger Agreement,*"[16] and the Trust's claim is predicated on other documents, including the OM. (D.I. 13 at 9 (emphasis added); Compl. at ¶ 82) Thus, the Release would not bar the actual fraudulent conveyance claim even if the Trustee was bound by such a prepetition waiver.

---

[16] Adv. D.I. 108-8 at 2 (emphasis added).

The Court agrees with the Trustee. Because the scope of the Release may present a disputed issue of fact, and is subject to further development through discovery, interlocutory review is not appropriate. Defendants have not identified a controlling question of law.

Nor have Defendants identified an issue on which there exists substantial grounds for disagreement. Defendants contend "precedent bearing on this matter is thin" (D.I. 1 at 19) and the Bankruptcy Court ignored observations made recently in *JLL Consultants, Inc. v. Hormel Foods Corp. (In re AgFeed USA LLC)*, 2015 WL 9133627 (Bankr. D. Del. Dec. 15, 2015). In *AgFeed*, the debtors had entered into a prepetition settlement agreement with a defendant, including a release and a requirement that the debtor issue a promissory note to the defendant. *See id.* at *2. Following the bankruptcy filing, the trustee initiated an action alleging that the issuance of the promissory note was a fraudulent transfer. *See id.* The court determined that the release "contemplates and provides for the situation that arose here, *i.e.*, a claim for fraudulent transfer," and the action was precluded by the release. *Id.* at *5. However, as the Bankruptcy Court determined, the decision in *AgFeed* was based on the specific facts of that case. The applicability, if at all, of that decision to the different facts here does not create substantial grounds for difference of opinion warranting interlocutory review. Additionally, the issue of whether a pre-petition release of claims like those involved here may be binding on a trustee was not briefed in *AgFeed*, nor did the defendant raise the argument. *See AgFeed*, 2015 WL 9133627, at *4-*5. Finally, it is well-settled that "prior to bankruptcy, a debtor may not waive bankruptcy rights that inure to the benefit of unsecured creditors not a party to that waiver." *Minn. Corn Processors, Inc. v. Am. Sweeteners, Inc. (In re Sweeteners, Inc.)*, 248 B.R. 271, 276 (Bankr. E.D. Pa. 2000)).

### B. Whether Immediate Appeal Will Materially Advance Termination of Litigation

Defendants argue that if they are successful on appeal of these issues, the entire case will be resolved. (*See* D.I. 1 at 20) They add that, absent interlocutory appeal, the parties may be forced to litigate issues and incur costs that might turn out to have been entirely unnecessary. (*See id.*) The Trustee counters that Defendants would have to prevail on ***both*** the prepetition release issue, which targets the Trustee's actual fraudulent transfer claim, and either the section 546(e) or ratification issues, which target the constructive fraudulent transfer claim, in order for there to be any chance of material advancement of termination of the litigation. (*See* D.I. 13 at 4) The Trustee also points to disputed issues of fact underlying the issues Defendants seek to appeal, observing that subsequent developments in the Bankruptcy Court may moot certain disputes, a further indication that immediate appeal would not materially advance the litigation. (*See id.* at 5)

Immediate appeal is not likely to advance the termination of this litigation. Defendants must succeed on more than one of their issues to terminate the litigation. Under the circumstances, an immediate appeal of one or all of these issues "would only promote piecemeal determination of the questions raised in the adversary action and would likely create unnecessary delay." *AE Liquidation*, 451 B.R. at 348.

### C. Whether Exceptional Circumstances Justify Immediate Appeal

Because an interlocutory appeal represents a deviation from the basic judicial policy of deferring review until after the entry of final judgment, the party seeking leave to appeal an interlocutory order must also demonstrate that exceptional circumstances exist. *See In re Advanced Marketing Services, Inc.*, 2008 WL 5680878 (D. Del. April 3, 2008). "Interlocutory appeal is meant to be used sparingly and only in exceptional cases where the interests cutting in

favor of immediate appeal overcome the presumption against piecemeal litigation." *AE Liquidation*, 451 B.R. at 349 (internal quotation marks omitted).

Defendants' opening brief did not identify any exceptional circumstances that might warrant deviation from the final judgment rule. (*See* D.I. 1) In their reply brief, Defendants argue that exceptional circumstances are present based on the "conflict with *Barclays* and *Tribune* and potential for a circuit split on an important issue of bankruptcy jurisprudence involving the scope of [s]ection 546(e)," together with "the lack of any controlling Third Circuit precedent on the estoppel and release issues." (D.I. 18 at 17)

The Court is not persuaded that exceptional circumstances are presented here. Defendants have failed to point to "any circumstance or reason that distinguishes the case from the procedural norm and establishes the need for immediate review." *In re Magic Rests., Inc.*, 202 B.R. 24, 26-27 (D. Del. 1996).

**5.** *Conclusion.* For the reasons explained above, the Court will deny Defendants' Motion for Leave to appeal the Interlocutory Order. Accordingly, the Petition is also denied.

December 21, 2017
Wilmington, Delaware

HON. LEONARD P. STARK
UNITED STATES DISTRICT JUDGE